IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PATRICK ALLEN TRENT,

    Petitioner,                No. CIV S-02-1647 DFL JFM P

    vs.

JOE McGRATH, Warden, et al.,

    Respondents.           FINDINGS & RECOMMENDATIONS

_____/

         Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1999 conviction on charges of murder and engaging in street terrorism. He seeks relief on the grounds that he received ineffective assistance of counsel and the trial court committed jury instruction error. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

                           PROCEDURAL AND FACTUAL BACKGROUND[1]

         A jury convicted [petitioner's co-defendant] Nico Luciano Vasquez
of murdering Primotivo Villasana (Pen. Code, § 187 – count one),

---

[1] This statement of facts is taken from the October 2, 2001, opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 3-8, appended as Exhibit A to Respondent's Answer, filed on October 16, 2002.

1

and engaging in street terrorism (§ 186.22, subd. (a) – count two).[2] It found true allegations Vasquez personally used a knife in the murder (§ 12022, subd. (b) (1)), and committed the crime for the benefit of, or at the direction of, a criminal street gang (§ 186.22, subd. (b) (1)). The court sentenced Vasquez to 28 years to life in prison. The same jury convicted [petitioner] Patrick Allen Trent, Jr., of murder and street terrorism. The court sentenced [petitioner] to prison for 25 years to life plus eight months.

* * *

Primitivo Villasana was found dead with numerous stab wounds in Stockton's Weber Park the night of February 2, 1997. Known as "Tivo" or "Primo," the victim was a heroin addict and former member of Northern Structure, a Northern California gang composed of prison parolees and street gang members with ties to the Nuestra Familia prison gang. Witnesses had observed a fight in the park involving two or three men against one. However, none came forward with information on the killers during the initial investigation.

The case broke when Stockton Police Detective Cliff Johnson interviewed Tony Giminez on April 9, 1997, the day after his arrest for the robbery of Yum Yum Donuts. Giminez, the leader of the Stockton regiment of Northern Structure, agreed to provide testimony in the investigation and prosecution of gang members in exchange for a substantially reduced robbery sentence. He named Vasquez, his second in command, and [petitioner], an associate of Northern Structure, as the persons responsible for Villasana's death. Giminez explained that Villasana was classed as a "dropout" for refusing to carry out his gang responsibilities while imprisoned at Deuel Vocational Institute (DVI). He said a guy named "Lucky" told him in 1992 that Villasana was on the gang's hit list. Giminez spread the information when he was released from DVI. Vasquez telephoned Giminez the night of the 1997 murder. After asking if Giminez remembered "Tivo," Vasques said, "We got him." DNA tests on bloodstains placed Vasquez at the scene of the crime.

The district attorney went to trial on the theory the murder was the gang execution of a dropout to advance the defendants' status in Northern Structure. He initially intended to rely on testimony from Giminez and Detective Nick Garcia, his gang expert. Additional key evidence surfaced during trial.

Betty Talaga, Vasquez's former girlfriend, had denied knowledge of the killing and Vasquez's gang connections in her preliminary hearing testimony. She was scheduled to testify at defendants'

---

[2] Undesignated statutory references are to the Penal Code.

trial, but approached Detective James Ballard with additional information on December 16, 1998, the second day of trial testimony.  The district attorney and FBI obtained detailed statements from Talaga on December 16 and 17.  The district attorney disclosed the turn of events on Monday, December 21, after safety concerns had been addressed.  He provided the defense with tapes of the Talaga interviews and other related discovery.

Talaga testified at trial on January 13, 1999.  She stated that Vasquez and [petitioner] helped her move into an apartment near Weber Park on February 2, 1997.  Defendants went to a nearby store while Talaga continued unpacking.  While they were gone, Villasana came to Talaga's front door.  Although Villasana was staggering and appeared to be drunk, Talaga did not consider him threatening.  Defendants returned at that point, and Vasquez yelled, "What the fuck are you doing at my door?"  He told Talaga to close the door.  She heard Villasana respond, "What's up, Nico?  Why you got to talk to me like that?"

Defendants remained outside on the steps talking and drinking with Villasana, and Talaga continued to unpack.  Vasquez came into the apartment twice – once to get more beer, and once to take something she could not see from a kitchen drawer that contained knives.  She later identified a broken knife handle and knife blade found at the scene, and testified her knives were not broken when she last saw them.

Vasquez told Talaga he was going for a walk around the corner.  She watched defendants and Villasana head toward the park as it was starting to get dark.  Vasquez returned about 45 minutes later, went to the drawer, and got a butcher knife with a wooden handle.  He told Talaga the first knife had broken because it was too skinny.  Vasquez said he needed the knife to take care of his business.  Talaga testified Vasquez was mad, out of breath, but uninjured at the time.

Vasquez returned 15 or 20 minutes later, looking like he had been fighting.  His shirt was torn, and he was bleeding.  He had a bloody knife with him, which Talaga put in the sink.  Vasquez told her to clean it with alcohol or Clorox.  He also told Talaga to say she had not seen him if the police came.  Talaga cleaned the wound on Vasquez's hand, and put a towel over it.  Vasquez took her car, saying he was going to take [petitioner] home, then return.  Vasquez did not return to the apartment that night.

Talaga saw Vasquez at his sister's house several days after Villasana was killed.  He showed Talaga a newspaper article about the murder and explained, "This is what I did last night."  He said he threw the clothes he was wearing into a creek behind his mother's house.  Vasquez later told Talaga he cut Villasana's throat, and one of the knives broke during the assault.  Vasquez

and [petitioner] met with Talaga to discuss what to tell police about the night of the murder.

At some point after the murder, Talaga watched while [petitioner] had a star tattooed under his eye. Vasquez said, "He's a killer now." Talaga also heard Vasquez tell [petitioner] "he done killed a man."

Xavier Lozano provided additional evidence the crime was gang-related. The court ruled at the close of in limine motions that Lozano would not testify due to a conflict in representation, and the potential need to sever [petitioner's] trial. The district attorney pressed the argument he needed Lozano's testimony. The court changed its ruling on January 7, 1999, finding no actual conflict, and that the defense had sufficient time to review discovery on Lozano.

Lozano testified on January 14, 1999, near the end of the prosecution's case. He had participated in the Yum Yum Donuts robbery, and entered into a plea agreement with federal authorities which resulted in a prison sentence of five years in exchange for cooperation with law enforcement. Lozano stated he previously held the highest position in Northern Structure, responsible for overall security inside and outside of prison. He testified that Vasquez had been a gang member for three or four years, and Trent was a sympathizer. While Lozano was imprisoned at Pelican Bay, he received instructions that all dropouts in Stockton should be killed. He relayed the information directly to Gimenez and Vasquez upon his parole. Lozano explained that by killing Villasana, defendants would gain status within Northern Structure, and possibly become eligible for membership in Nuestra Familia.

Defense counsel declined to cross-examine Lozano. Trent's attorney, Judy Hansen, worried about the possible conflict in representation. Both she and Jeff Silvia, Vasquez's attorney, complained they had insufficient time to prepare for cross-examination due to the late discovery on Lozano.

Thereafter, Trent testified on his own behalf. He acknowledged he left Talaga's apartment with Vasquez and Villasana after dark on February 2, 1997, to get more beer. As the men neared the park, Trent walked ahead of Vasquez and Villasana. Trent turned when he heard a commotion, and saw Vasquez and Villasana wrestling on the ground. He asked Vasquez what was happening, but got no answer. Trent testified he saw Vasquez on top of Villasana, repeatedly punching him. He did not see a knife. Trent denied kicking, punching, or touching Villasana in any way.

Trent said, "Come on, Nico, let's go," and started walking away from the park. Vasquez eventually caught up with Trent, and they returned to Talaga's apartment. He watched Talaga clean the cut

on Vasquez's hand, but denied seeing Vasquez give Talaga a knife. Vasquez never told Trent what happened in the park. Trent testified he got the star tattoo in November or December 1996, and it had no special significance.

In closing argument, defense counsel maintained Villasana's killing was not premeditated, first degree murder. Instead, Villasana had picked a fight, possibly related to his quest for heroin, and got in over his head. The defense insisted Villasana was not a threat to Northern Structure. He had been on the hit list since 1991 or 1992, and there was no status to be gained in killing him.

## ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 573 U.S. 3, 8 (2002) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ

5

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II. Petitioner's Claims

    A. Ineffective Assistance of Counsel

Petitioner's first claim is that he was denied his constitutional right to the effective assistance of counsel because his trial attorney had a conflict of interest. The background to this claim is the following.

Petitioner and co-defendant Vasquez were charged with gang enhancements pursuant to Cal. Pen. Code. § 186.22. The prosecution's theory of the case was that the murder of Villasana was the execution of a gang "dropout," committed to advance the status of petitioner and Vasquez in the Northern Structure. In support of this theory, the prosecutor intended to rely, in part, on testimony from Detective Nick Garcia, a gang expert.

Prior to Garcia's testimony, the court and counsel engaged in numerous discussions designed to clarify the topics about which Garcia could testify. (See e.g., Reporter's Transcript on Appeal (RT) at 393-588.) The defense attorneys argued, generally, that Garcia should not testify to the "ultimate fact" that the killing was related to gang activities because that was a matter for the jury to decide. (Id. at 369-72.) Defense counsel specifically objected to testimony that the Northern Structure had instructed its members that they "better have a dropout

1 under their belt or they better have attacked a dropout prior to serving any prison sentences." (Id.
2 at 538-43.) Ultimately, the trial court ruled that Detective Garcia could not testify, without
3 further corroboration, that Vasquez and Gimenez had been informed that gang dropouts were on
4 a Northern Structure "hit list." (Id. at 792.) At that point, the prosecution stated that it would
5 call Xavier Lozano as a witness to corroborate Garcia's proposed testimony about the hit list.
6 (Id. at 793-94.)

7 Lozano had been arrested in 1997 for his involvement in a robbery of Yum Yum
8 Donuts and had entered into a cooperation agreement with state and federal authorities. (Id. at
9 2796-98.) When petitioner's counsel learned that the prosecutor intended to call Lozano as a
10 trial witness, she informed the court that one of her co-workers at the public defender's office
11 had represented Lozano when the cooperation agreement was prepared and that the prosecutor
12 had told her over a year before that he would not call Lozano as a witness. (Id. at 793.) The
13 prosecutor explained that he had not planned to use Lozano but was now compelled to do so
14 because of the court's ruling with respect to the testimony of Garcia. (Id. at 794.) The trial court
15 ruled that Lozano could not testify because of the potential conflict, explaining its reasoning as
16 follows:

> MR. FREITAS (the prosecutor): I believe the State charges were dismissed as to Xavier Lozano. He's being represented by I believe the federal public defendant's office. Not being represented by the public defender's office at this time in our county.
>
> THE COURT: Doesn't have to be at this time. Was he at the time that the plea was entered into or that the matter was resolved?
>
> MR. FREITAS: I believe he was.
>
> THE COURT: Mr. Lozano is not testifying. I am not going to create that conflict or that goes right back to severing the defendants out and going to trial on Mr. Vasquez only. That creates a conflict that cannot be rectified within the public defender's office. It puts Miss Hansen (petitioner's counsel) right in the middle.

26 /////

> So at this point the Court is not going to allow Mr. Lozano to testify based upon the conflict and the representations that that would not be the case.
>
> * * *
>
> And based on accepting the representations that there was an understanding and agreement that Mr. Lozano was not going to be called by the prosecution over a year ago, and if that's the case, they are bound by that. If now they need Mr. Lozano, too bad.

(Id. at 795, 799.) Later during the same hearing, petitioner's counsel informed the court that her co-worker refused to speak to her about his prior representation of Lozano. (Id. at 802.)

Later in the proceedings, the prosecutor presented the trial court with People v. Clark, 5 Cal.4th 950 (1993), and again argued that there was no conflict presented by the public defender's prior representation of Lozano. (RT at 2039, 2051.) Petitioner's counsel argued, "I think that there is always the chance that there is a conflict. I cannot anticipate what Mr. Lozano's testimony is going to be or where it's going to go and how far." (Id. at 2039.) The prosecutor responded that because petitioner's counsel had no confidential information, "there [was] an apparent conflict, [but] no actual conflict." (Id. at 2041.) Relying on the Clark decision, the trial court decided there was no conflict because the state case against Lozano had been dismissed. (Id. at 2041-42, 2052.) This was true "[p]articularly where the individual [testifies] with the presence of his federal defender or by his own waiver without anybody's assistance." (Id. at 2042.)

The trial court then proceeded to address the need for defense discovery in order to prepare for Lozano's testimony. (Id. at 2061-62.) At the conclusion of Lozano's direct examination, counsel for both petitioner and co-defendant Vasquez refused to cross-examine him. (Id. at 2808, 3089.) The court nevertheless found there had been sufficient time to prepare for cross-examination. (Id. at 2811.)

The California Court of Appeal rejected petitioner's claim that he received ineffective assistance of counsel because of an attorney conflict of interest. The court first noted that the public defender's office did not represent Lozano at the time of petitioner's trial;

therefore, petitioner's counsel "had no interest in 'attempting to shield [Lozano] from impeachment or to otherwise ensure that [his] testimony was well-received.'" (citation omitted.) (Opinion at 15.)   The appellate court also noted that petitioner's counsel did not state she possessed confidential information arising from her colleague's former representation of Lozano during the negotiation of his plea agreement with federal authorities.  (Id.)  Indeed, that colleague refused to discuss Lozano's case with petitioner's counsel.  Third, the state appellate court noted that petitioner's counsel did not provide any tangible support for her "repeated allusions to potential conflict."  (Id.)  The court explained:

> On December 22, 1998, the court directed [petitioner's counsel] and the district attorney to deal with the issue by December 28. Nothing more was said until January 6, 1999, when the district attorney argued there was no conflict under Clark.  Just before Lozano testified on January 14, [petitioner's counsel] again stated: "I am not convinced that I do not have a conflict."  The court responded that it had ruled on the conflict issue "based upon all the information presented to me and I believe it's the correct conclusion.  Unless there is additional evidence or additional argument based upon new evidence or new issues and I will revisit the issue."  [Petitioner's counsel] offered nothing more in open court or in camera.  Although precise details of her purported concerns regarding a potential conflict of interest might have involved confidential information, at that juncture it was incumbent on [petitioner's counsel] to outline the nature of her concerns more precisely for the court.

(Id. at 16.)

The appellate court's conclusion that there was no conflict under the circumstances presented by petitioner's case was based on the following reasoning:

> Here, there was no simultaneous dual representation of defendant Trent and the witness Lozano.  Lozano was serving five years in the federal penitentiary under the federal agreement at the time he testified.  There were no pending state proceedings.  The record does not indicate whether Lozano's federal defender was, in fact, present during his trial testimony.  However, the district attorney earlier represented to the court that the federal defender did not believe his presence was required.

/////
/////

> On this record we discern no potential conflict with respect to [petitioner's] interests. We believe Hansen's concerns regarding what cross-examination of Lozano might open up for rebuttal were related to the discovery issue, which we address below. Having concluded the record reveals no conflict, actual or potential, we need not consider whether [petitioner's counsel's] performance was adversely affected by the alleged conflict, or whether the court failed to adequately investigate it. (citations omitted.) Before turning to the question of discovery, however, we briefly address [petitioner's] claim that [petitioner's counsel's] election not to cross-examine Lozano provided the requisite proof [counsel's] performance was adversely affected by a real or potential conflict.
>
> "[W]hen a conflict assertedly causes an attorney not to pursue an argument or defense, a reviewing court cannot 'see' the adverse effect on the record. Consequently, [the reviewing court] must examine the record to determine whether (I) the arguments or actions allegedly omitted would likely have been made by other counsel, and (ii) there was a tactical reason (other than the asserted conflict) that might have caused the omission." (citation omitted.) A determination that the attorney's performance was adversely affected turns on the circumstances of each case. Where, as here, the defense attorney fails to make a record to support a claim of actual or potential conflict, we believe the unusual tactical decision not to cross-examine is insufficient to resurrect the conflict issue on appeal.

(Id. at 17-18.)

It is well established that the right to effective assistance of counsel carries with it "a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). See also Campbell v. Rice, 302 F.3d 892, 897 (9th Cir. 2002). In order to establish an ineffective assistance of counsel claim based on a conflict of interest a petitioner must show that an actual conflict of interest adversely affected his lawyer's performance. Cuyler v. Sullivan, 446 U.S. 335, 348-350 (1980). See also Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002) (an actual conflict "is not something separate and apart from adverse effect"). The existence of an actual conflict "cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." Sanders v. Ratelle,

21 F.3d 1446, 1452 (9th Cir. 1994). An adverse effect in the Cuyler sense must be one that "significantly worsens counsel's representation of the client before the court or in negotiations with the government." United States v. Mett, 65 F.3d 1531, 1535 (9th Cir. 1995). Although a defendant alleging a conflict of interest "need not demonstrate prejudice," he must prove that "counsel actively represented conflicting interests." Cuyler, 446 U.S. at 349. Courts "generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." Burger v. Kemp, 483 U.S. 776, 784 (1987).

Petitioner has failed to demonstrate that his trial counsel "actively represented conflicting interests" or that "an actual conflict of interest adversely affected his lawyer's performance." At the time of petitioner's trial, the public defender's office did not represent Lozano and the attorney who had represented him in the past refused to communicate with petitioner's counsel about the particulars of Lozano's case. As explained by the state appellate court, under these circumstances there is no evidence that petitioner's counsel had any reason to protect Lozano, that she was in possession of any confidential information arising from negotiations on Lozano's plea agreement, or that anything about Lozano's case would have had an adverse effect on petitioner's case. Further, although petitioner's counsel repeatedly asserted a possible conflict, she did not come forward with any support for these assertions. Her vague and unsupported allegations and suspicions do not establish an "actual conflict." There is also no evidence that Lozano's representation by trial counsel's colleague prejudiced petitioner in any way. As noted by the state appellate court, counsel's decision to forego cross-examination of Lozano is insufficient to establish an adverse effect on her performance in the absence of any real evidence of an actual conflict.

This court also notes that the conclusion of the California Court of Appeal that there was no actual conflict under the circumstances presented by this case is not contrary to or an unreasonable application of clearly established United States Supreme Court authority. Ordinarily, to establish that trial counsel's representation failed to meet Sixth Amendment

standards, a petitioner must show that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) prejudice. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). As discussed above, United States Supreme Court precedent allows a petitioner to demonstrate ineffective assistance of counsel without a showing of deficient representation or prejudice where "an actual conflict of interest adversely affected his lawyer's performance." <u>Sullivan</u>, 446 U.S. at 348; <u>Holloway v. Arkansas</u>, 435 U.S. 475, 478-80 (1978); <u>Wood</u>, 450 U.S. at 269-72. This exception to the <u>Strickland</u> requirements is limited by Supreme Court precedent to situations involving "multiple concurrent representation." <u>Mickens</u>, 535 U.S. at 174-76; <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1183-84 (9th Cir. 2005). Any extension of <u>Sullivan</u> outside of this context, as far as the jurisprudence of the Supreme Court is concerned, is "an open question." <u>Mickens</u>, 535 U.S. at 176; <u>Earp</u> 431 F.3d at 1184.

This case does not involve joint representation of co-defendants in the same trial. The United States Supreme Court has not held that the <u>Sullivan</u> exception applies to conflicts stemming from prior representation of a prosecution witness by another lawyer in the same firm as defense counsel. For this reason, the decision of the California Court of Appeal rejecting petitioner's claim in the factual context presented by this case is not contrary to <u>Sullivan</u> and <u>Holloway</u> and may not be set aside in this federal habeas corpus proceeding. <u>Mickens</u>, 535 U.S. at 174-77; <u>Earp</u>, 431 F.3d at 1184-85.

B. <u>Jury Instruction Error</u>

Petitioner claims that jury instruction error violated his right to due process. Petitioner's claim is stated, in full, as follows:

> The instructions given to the jury allowed them to convict me of first degree murder without finding an essential element of the crime (that an aider/abettor knew or should have known the purpose of the perpetrator).

(Pet. at 5.)

In state court, petitioner claimed that "the trial court's erroneous and confusing instructions defining the crime of murder and principles of aiding and abetting unconstitutionally

relieved the prosecution of the burden of proving the essential element of premeditation, or any lawful equivalent, in a prosecution for premeditated murder. (Answer, Ex. B at 19.) More specifically, petitioner argued that the jury instructions given at his trial:

> not only corrupted the natural and probable consequences doctrine and aider/abettor principles, it directed the jury to convict [petitioner] of first degree murder even if they found only that [petitioner] could reasonably foresee an intentional, but unpremeditated killing occurring as a consequence of the simple assault. This formulation had the effect of relieving the prosecution of its duty to prove the element of premeditation, or a legally sufficient alternative, and unconstitutionally reduced the prosecution's burden of proof.

(Id.) Respondent argues that petitioner's claim raised in the instant petition is different than his claim in state court and is, therefore, unexhausted.

Even assuming arguendo that petitioner's claim in this court is unexhausted, it should be denied pursuant to 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). A federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir.2005). Petitioner's argument that his jury instructions allowed the jury to convict him of first degree murder without finding that he knew or should have known the "purpose" of the perpetrator is not "colorable" and should be denied.

A challenge to jury instructions does not generally state a federal constitutional claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). In order to warrant federal habeas relief, a challenged jury instruction cannot be merely "undesirable, erroneous, or even universally condemned, but must violate some due process right guaranteed by the Fourteenth Amendment." Prantil v. State of California, 843 F.2d at 317 (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)) (internal quotes omitted). To prevail on such a claim

petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process." Prantil, 843 F.2d at 317 (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)). In making its determination, this court must evaluate the challenged jury instructions "in the context of the overall charge to the jury as a component of the entire trial process." Id. (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

Petitioner's jury was instructed with CALJIC No. 3.01, as follows:

> A person aids and abets the commission or attempted commission of a crime when he or she,
>
> 1. With knowledge of the unlawful purpose of the perpetrator and
>
> 2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime; and
>
> 3. By act or advice aids, promotes, encourages or instigates the commission of the crime.

(Clerk's Transcript on Appeal (CT) at 1098.) The jury was also instructed with CALJIC No. 3.02, as follows:

> One who aids and abets another in the commission of a crime is not only guilty of that crime but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.
>
> In order to find the defendant guilty of the crime of murder as charged in Count 1, you must be satisfied beyond a reasonable doubt that:
>
> 1. The crime or crimes of assault or battery were committed;
>
> 2. That the defendants aided and abetted those crimes;
>
> 3. That a co-principal in that crime committed the crime of murder, and
>
> 4. The crime of murder was a natural and probable consequence of the commission of the crime of assault or battery.

(Id. at 1099.)

/////

1       The plain language of these two instructions required the jury to find that
2 petitioner knew the unlawful purpose of the perpetrator; in this instance, assault or battery, and
3 that the crime of murder was a natural and probable consequence of the crime of assault or
4 battery. There was no due process violation under these circumstances.

5       Assuming arguendo that petitioner is raising the same claim he raised in state
6 court, it should also be denied. Petitioner argued in state court that first degree murder was not a
7 foreseeable consequence of assault and battery because the latter offenses are not inherently
8 dangerous. (Opinion at 46.) The state court concluded, after a discussion of state law, that a
9 conviction for first degree murder based on aider and abettor liability and the natural and
10 probable consequences doctrine comported with the requirements of due process. (Id. at 46-49.)
11 The United States Court of Appeals for the Ninth Circuit has upheld a similar challenge to a
12 murder conviction based on California's jury instructions regarding aiding and abetting liability
13 and the doctrine of reasonable and foreseeable circumstances. See Spivey v. Rocha, 194 F.3d
14 971, 975-77 (9th Cir. 1999) (a misdemeanor can support a "natural and probable consequences"
15 aiding and abetting murder conviction).

16       Petitioner has also failed to demonstrate that the state court's decision is contrary
17 to or an unreasonable application of United States Supreme Court precedent. Under the specific
18 facts and circumstances of this case, the California Court of Appeal's decision that it was proper
19 for the jury to be instructed regarding the natural and probable consequences doctrine was not
20 "objectively unreasonable," Andrade, 538 U.S. at 75, because there is no Supreme Court
21 precedent on point. On habeas review, with regard to jury instructions, a reviewing court must
22 not "engage in a technical parsing of [their] language, ... but instead approach the instructions in
23 the same way that the jury would--with a commonsense understanding of the instructions in the
24 light of all that has taken place at the trial." Johnson v. Texas, 509 U.S. 350, 368 (1993) (internal
25 quotations omitted). Petitioner's jury was presented with evidence that petitioner and Vasquez
26 killed Villasana in order to move up in the Northern Structure, and that after the killing petitioner

received a tattoo indicating that he had killed someone. Petitioner himself testified that he was present during the killing of Villasana. Based on these circumstances and upon evidence of petitioner's affiliation with a gang reputed to be violent, the jury could have inferred that petitioner knew Vasquez intended to kill the victim and was therefore guilty of first degree murder.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 27, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

008:trent1647.hc